UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Keith Sutton, | No. 2:22-cv-00732-KJM-CKD |
| Plaintiff, | ORDER |
| v. | |
| Metropolitan Life Insurance Company, et al., | |
| Defendants. | |

Plaintiff Keith Sutton contends he was wrongly denied long-term disability benefits under an employee benefits plan administered by Metropolitan Life Insurance Company (MetLife).  He is pursuing a claim against the benefits plan and MetLife under the Employee Retirement Income Security Act (ERISA).  As explained below, Sutton has shown that MetLife erroneously denied benefits under the plan.

I.     **BACKGROUND**

The dispute in this case is a narrow one.  Under the disability plan's policy documents, if an employee's disability is attributable to a neuromuscular or musculoskeletal condition, benefits are normally paid for only twenty-four months, even if the disability persists beyond twenty-four months, and even if the disability prevents the employee from earning any income at all.  *See* AR 789–790, ECF Nos. 028-1 to 028-4.  There is one exception to this twenty-four month limit.  An employee may continue to receive benefits beyond twenty-four months if "the Disability has

1

objective evidence of" at least one of six listed conditions.  *See* AR 789–90.  Only two of the six

listed conditions are relevant to this case: "Myelopathies"[1] and "Spinal Cord Damage."  *Id.*

at 789.

Sutton suffers from back pain that has prevented him from working for several years.  *See*

Pl.'s Br. at 3–4, ECF No. 26; Defs.' Br. at 3, ECF No. 27.  The parties do not currently dispute he

is disabled under the terms of the plan, and they do not dispute his condition is neuromuscular or

musculoskeletal.  *See* Pl.'s Br. at 6; Defs.' Br. at 16–17.  By the policy terms summarized above,

then, long-term benefits beyond twenty-four months are due to Sutton only if his "Disability has

objective evidence of" either "Spinal Cord Damage" or "Myelopathies."  *See* Pl.'s Reply at 3,

ECF No. 34.  Sutton and MetLife disagree whether that condition is satisfied, and that is the

narrow dispute at the center of this case, as Sutton already has received twenty-four months'

benefits.

Sutton's medical records are lengthy and sometimes contradictory.  As long ago as 2018,

Sutton's physician, Dr. John Lombard, recorded a diagnosis of myelopathy.  AR 459, 452.

Although Dr. Lombard recorded that diagnosis, he did not discuss the reasons for it or any testing

that supported it, such as x-rays or MRIs.  *Id.*  MetLife employees also repeatedly wrote in the

company's internal records that Sutton was out of work "due to intervertebral lumbar disorder

with myelopathy, lumbar region," among other conditions.  *See, e.g.*, AR 1440, 1449, 1452.  Like

Dr. Lombard's records, most of the MetLife records mention no medical imaging or similar test

results.  One record does mention an MRI in 2018.  AR 1431.  A note describes the MRI as

---

[1] The policy documents do not define "Myelopathies."  The parties describe myelopathy as "an injury to the spinal cord caused by severe compression," Pl.'s Br. at 2 n.1, ECF No. 26; Def.'s Br. at 1, ECF No. 27, and a number of internet sources aimed at the general public use similar language, *see, e.g.*, Johns Hopkins Medicine, "Myelopathy" (2023), https://www.hopkinsmedicine.org/health/conditions-and-diseases/myelopathy (last visited July 14, 2023); Cleveland Clinic, "Myelopathy" (Oct. 2, 2021), https://my.clevelandclinic.org/health/diseases/21966-myelopathy (last visited July 14, 2023).  More specialized reference guides define myelopathy using broader language that does not refer to compression.  *See, e.g.*, Stedman's Medical Dictionary, 583050 myelopathy (Nov. 2014) ("disorder of the spinal cord"); D.J. Seidenwurm, Myelopathy, 29 Am. J. Neuroradiology 1032–34, 1032 (May 2008) ("neurologic deficit related to the spinal cord").  These more specialized references also note that myelopathy is commonly caused by compression of the spinal cord.  *See, e.g.*, Seidenwurm, *supra*, at 1032.

1   showing "moderate central spinal stenosis."[2]  *Id.*  Spinal stenosis can, in turn, damage the spinal

2   cord or cause myelopathy.  *See* Louis, et al., *supra*; João Levy Melancia, et al., "Spinal Stenosis,"

3   119 Handbook of Clinical Neurology 541–49, 541 (Dec. 2013); *see also, e.g.*, *Huberty v.*

4   *Standard Ins. Co.*, No. 06-2388, 2008 WL 783407, at *29 (D. Minn. Mar. 25, 2008).

5           Other portions of Sutton's medical records expressly rule out myelopathy.  In 2018, for

6   example, a note from Sutton's pain management doctor, Jacob Blake, records a diagnosis of

7   "spondylosis *without* myelopathy or radiculopathy, lumbar region."[3]  AR 287 (emphasis added).

8   Dr. Blake's records include similar notes as recently as 2020.  *See* AR 1013.  But like

9   Dr. Lombard's notes, Dr. Blake's notes do not connect his assessment of no myelopathy to any

10   specific imaging or other test results.  *See id.*

11           Still other portions of Sutton's medical records are silent or ambiguous.  For example,

12   Dr. Kirkham Wood, a surgeon who performed a procedure to alleviate pain in Sutton's back in

13   2019, assessed the likely causes of Sutton's pain in early 2020.  *See* AR 1035.  He did not

14   diagnose Sutton with spinal cord damage or myelopathy but instead ascribed Sutton's back pain

15   to arthritis or some source other than his spine.  *See* AR 1036.  Elsewhere his records refer to

16   "spondylolysis" (not to be confused with spondylosis), a condition in which vertebrae slip out of

17   their ordinary alignment.  *See, e.g.*, *Maldonado v. Comm'r of Soc. Sec.*, No. 21-594, 2023 WL

18   243617, at *4 n.2 (S.D.N.Y. Jan. 18, 2023) (discussing this condition); *Stratton v. Life Ins. Co. of*

19   *N. Am.*, 589 F. Supp. 3d 1145, 1154 n.5 (S.D. Cal. 2022) (same).

20           Sutton's medical records also include reports of several medical imaging studies,

21   including the 2018 MRI cited in MetLife's notes.  According to the MRI report, the scan revealed

---

[2] Spinal stenosis is a narrowing of the spaces in the spine that can compress the spinal cord and nerve roots.  *See, e.g.*, *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1100 n.1 (9th Cir. 2003); U.S. Dep't of Health & Human Servs., Nat'l Institutes of Health, "Spinal Stenosis: Overview of Spinal Stenosis" (Jan. 2020), https://www.niams.nih.gov/health-topics/spinal-stenosis (last viewed July 14, 2023); Elan D. Louis, M.D., et al., "Ch. 110, Cervical And Lumbar Spinal Stenosis" in *Merritt's Neurology* (13th ed. 2015).

[3] Medical references describe spondylosis as the stiffening or general degradation of the vertebra, including in the lumbar spine.  *See, e.g.*, Stedman's, *supra*, 840410 spondylosis; Kimberly Middleton & David Fish, "Lumbar Spondylosis: Clinical Presentation and Treatment Approaches," 2 *Current Rev. of Musculoskeletal Medicine* 94–104, 95 (June. 2009).

1    "anterolisthesis,"[4] "spondylolysis," "moderate central canal stenosis," and "neural foraminal

2    narrowing."[5]  AR 899.  Sutton was also x-rayed in 2018, and the record includes a report of that x-

3    ray.  Like the 2018 MRI report, the x-ray report describes anterolisthesis and spondylolysis.  *Id.*

4    Unlike the MRI report, however, it does not mention stenosis.  *Id.*  Neither the MRI nor the x-ray

5    mentions spinal cord damage or myelopathy.  Sutton also underwent an MRI and x-ray in 2021.

6    According to the report of the later MRI, imaging revealed "[n]o significant central canal stenosis

7    or neural foraminal narrowing."  AR 901.  The x-ray report again described anterolisthesis and

8    spondylosis.  AR 900.  Like the 2018 reports, neither of the 2021 reports refers to myelopathy or

9    spinal cord damage.

10          Finally, Sutton has reported pain in his back and weakness and numbness in his legs.  *See,*

11   *e.g.*, AR 833–34.  In some clinical tests and exams, he has also exhibited diminished or even

12   absent reflexes in his legs or feet.  *See, e.g.*, AR 27, 34, 290, 1067.

13          MetLife reviewed Sutton's medical records and informed him in early 2021 that it would

14   not offer benefits beyond twenty-four months because it had found no "objective evidence" of

15   myelopathy or spinal cord damage.  AR 1360–62.  Sutton appealed that decision in an internal

16   administrative process.  AR 987–1004.  In response, MetLife hired Dr. John Zheng, who is board

17   certified in physical medicine, rehabilitation and pain medicine, to review Sutton's medical

18   records.  AR 958–65.  Zheng found no "objective evidence of myelopathy."  AR 962.  He relied

19   on clinical records showing Sutton could walk and move his arms and legs normally despite pain

20   and tenderness in his back.  AR 963.

21          MetLife forwarded Zheng's opinions to Sutton's counsel, who responded with additional

22   medical records, including the reports of his 2021 x-ray and MRI, which had not been completed

23   at the time of MetLife's original denial.  *See* AR 892–905.  Sutton's attorneys also forwarded a

24   letter from Dr. Blake, Sutton's pain management specialist.  *See* AR 905.  Blake wrote that in his

25   opinion, Sutton was "totally disabled" as a result of his symptoms, which were caused by "[l]ow

---

[4] Anterolisthesis is similar to spondylolysis.  *See*, *Maldonado*, 2023 WL 243617, at *4
n.2; *Stratton*, 589 F. Supp. 3d at 1154 n.5.

[5] The neural foramina are the openings through which nerves exit the spinal canal.  J.
Stanley McQuade, *Medical Information System For Lawyers* § 6:32 (2d ed. Aug. 2022 Update).

1   back pain," among other diagnoses.  *Id.*  Blake cited the x-ray and MRI reports described above,

2   and he quoted those reports, including their language about anterolisthesis, spondylolysis, central

3   canal stenosis and foraminal narrowing.  *Id.*  But Blake did not offer a diagnosis of spinal cord

4   damage or myelopathy, and he did not ascribe Sutton's pain to spinal cord damage or

5   myelopathy.

6        MetLife asked Zheng whether the new information changed his opinions.  *See* AR 857–

7   58.  It did not; as before, he believed, "[t]he information [did] not support the claimant having

8   objective evidence of myelopathy."  AR 858.  First, Zheng saw no clinical signs of myelopathy.

9   *Id.*  Second, he cited the 2021 MRI report and its statement that the MRI had revealed "no

10  significant central canal stenosis."  *Id.*  Third, Zheng wrote "there is no cord" in the area of the

11  spine "where most of [Sutton's] findings are located."  *Id.*  "[T]his is the level of the cauda

12  equina," he explained, "not the myelon."[6]  *Id.*

13       MetLife sent Zheng's updated assessment to Sutton's counsel.  AR 848.  Counsel

14  contended MetLife had required more evidence from Sutton than the plan actually demanded, AR

15  832–33, and he pointed out that Sutton's symptoms—such as pain, numbness, and absent reflexes

16  in his legs—could be attributable to myelopathy, AR 833–34.  MetLife referred the case to Zheng

17  once more.  *See* AR 821–23.  Zheng stood by his opinion that Sutton had not identified any

18  objective evidence of myelopathy.  *See id.*  Zheng dismissed Sutton's reports of pain and

19  numbness as subjective.  AR 822.  He found the MRI and x-ray reports unenlightening; they did

20  not "confirm" the "spinal cord itself" had been "impacted."  *Id.*  The same was true of reports that

21  Sutton's leg reflexes were absent.  "Absent reflexes do not suggest myelopathy by themselves,

22  and lower extremity reflexes can disappear with age itself."  *Id.*

23       In light of these opinions, MetLife upheld its decision to deny benefits beyond twenty-

24  four months, citing a lack of "objective evidence" of myelopathy.  AR 803–07.  Sutton then filed

25  this case.  *See generally* Compl., ECF No. 1.  MetLife has lodged the administrative record, and

---

[6] The cauda equina is "the bundle of spinal nerve roots . . . below the first lumbar vertebra; it comprises the roots of all the spinal nerves below the first lumbar."  Stedman's, *supra*, 151640 cauda equina.  The myelon is the spinal cord.  *See, e.g.*, William W. Campbell, et al., DeJong's the Neurological Examination Ch. 2 (8th ed. 2019).

1   the parties submitted full trial briefs.  *See generally* Pl.'s Br.; Defs.' Br.; Pl.'s Resp., ECF No. 31;

2   Defs.' Resp., ECF No. 32; Pl.'s Reply; Defs.' Reply, ECF No. 35.  The court held a bench trial on

3   the administrative record on June 30, 2023.  Michael Horrow appeared for Sutton, and Robert

4   Hess appeared for MetLife.

5   **II.   LEGAL STANDARD**

6        ERISA permits a plan participant to file a lawsuit in federal district court "to recover

7   benefits due to him under the terms of his plan."  29 U.S.C. § 1132(a)(1)(B); *see also Metro. Life*

8   *Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).  When a plan participant contends benefits were

9   wrongfully denied, a federal court ordinarily reviews the denial "de novo."  *See Metro. Life*,

10  554 U.S. at 111; *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en

11  banc).  Sutton and MetLife agree this is a case of "de novo" review.  *See* Order (Oct. 4, 2022),

12  ECF No. 21.  When a court reviews de novo, its task is not to decide for itself whether the

13  plaintiff is disabled and whether benefits are due.  *Collier v. Lincoln Life Assurance Co. of Bos.*,

14  53 F.4th 1180, 1182 (9th Cir. 2022).  The court instead examines the record of the plan

15  administrator's decision and decides whether the plan administrator erred.  *Id.*  This investigation

16  must be "independent and thorough."  *Silver v. Executive Car Leasing LTD Plan*, 466 F.3d 727,

17  728 (9th Cir. 2006).  The court does not defer to the administrator's conclusions.  *Collier*, 53

18  F.4th at 1182.  It is the plaintiff's obligation to show benefits were wrongly denied under the

19  terms of the plan.  *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010).

20  **III.   DISCUSSION**

21       As summarized above, this case boils down to a disagreement whether Sutton's

22  "Disability has objective evidence of" either "Spinal Cord Damage" or "Myelopathies" under the

23  terms of his employer's long-term disability plan.  AR 789.  That dispute raises two questions.

24  The first is essentially a question of contract interpretation: what does the policy mean when it

25  says a "Disability has objective evidence" of "Myelopathies" or "Spinal Cord Damage"?

26       When federal courts interpret ERISA policies, they rely on interpretive rules courts have

27  developed in previous ERISA actions, i.e., the "federal common law" developed through reason

28  and experience.  *PM Grp. Life Ins. Co. v. W. Growers Assur. Tr.*, 953 F.2d 543, 546 (9th Cir.

1992) (quoting *Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1499 (9th Cir. 1984)).
State law can offer guidance in uncertain cases, but in the end, the court must adopt whatever rule
best implements ERISA's regulatory scheme. *Dowdy v. Metro. Life Ins. Co.*, 890 F.3d 802, 807
(9th Cir. 2018) (quoting *PM Grp.*, 953 F.2d at 546).  Congress's general purposes for the ERISA
regulatory scheme were "to protect . . . the interests of participants in employee benefit plans and
their beneficiaries" and "to 'increase the likelihood that participants and beneficiaries . . . receive
their full benefits.'"  *Id.* (alterations in original) (quoting 29 U.S.C. §§ 1001(b), 1001b(c)(3)).

One settled interpretive rule requires that any ambiguities in a policy's terms be resolved
in favor of the plan participant or beneficiary.  *See, e.g.*, *Feibusch v. Integrated Device Tech., Inc.
Emp. Ben. Plan*, 463 F.3d 880, 886 (9th Cir. 2006).  Another settled interpretative rule requires
courts to construe exclusions in favor of coverage.  *Dowdy*, 890 F.3d at 810.  Both of these rules
apply in this case.  The disputed phrase is within a benefits limitation that operates as an
exclusion; it withholds payments that would otherwise be due.  And as explained below, the
disputed policy language is confusing and ambiguous.

The first word in the disputed phrase—"Disability"—is a defined term with three
conditions.  *See* AR 789.  First, the person must be suffering from a "Sickness" or "accidental
injury."  *Id.*  Second, the person must be receiving appropriate care and treatment and "complying
with the requirements of such treatment."  *Id.*  Third, due to the sickness, or as a direct result of
the accidental injury, the person must be unable to earn the income they had previously been
earning; the plan imposes specific percentage reductions in post-disability earnings.  *See id.*
"Disability," in other words, is a status; it is the satisfaction of several conditions.

For that reason, it is an odd thing to ask whether a "Disability has evidence of" a
condition.  People do not ordinarily say that statuses have evidence of the conditions behind them.
It would make no sense to say, for example, that "good standing to practice law in the State of
California," a status, "has a record of bar passage," a necessary condition of good standing.
Statuses like "Disability" or "good standing to practice law" might be proven by evidence, and
evidence might satisfy a prerequisite or condition, but people—not their status—are the ones who
"have" that evidence.  "Disability," in other words, is an explanation of what purpose the

1   "objective evidence" will serve, not the possessor of that evidence.  The court therefore interprets

2   the disputed policy phrase as requiring objective evidence of myelopathy or spinal cord damage

3   among the evidence offered to support the conclusion that a plan participant is disabled.

4          This interpretation eliminates only part of the policy's ambiguity.  The policy does not say

5   how conclusive or extensive the "objective evidence" must be; it asks simply for evidence "of"

6   myelopathy or spinal cord damage.  Is "evidence of" a condition evidence ruling out other

7   potential causes?  *See, e.g.*, AR 822; *see also* Defs.' Resp. at 3–5.  Or must a doctor have relied

8   on that objective evidence to make a specific diagnosis?  *See, e.g.*, Defs.' Br. at 10; Defs.' Resp.

9   at 5–7.  By asking for "objective evidence of" myelopathy or spinal cord damage, the policy

10  could quite reasonably be asking for some objective evidence—any objective evidence—that

11  tends to prove myelopathy or spinal cord damage.  *See, e.g.*, Evidence, Black's Law Dictionary

12  (11th ed. 2019).  The plan could, in other words, simply require more than just subjective reports.

13  After all, the policy does not demand evidence "proving" or "establishing" myelopathy.  The

14  court must construe the policy in favor of coverage and resolve ambiguities in Sutton's favor.  For

15  that reason, the court cannot interpret the policy as requiring conclusive proof, objective evidence

16  ruling out other causes, or a doctor's opinion that some specific objective evidence supports a

17  particular diagnosis.  The court construes the policy as requiring only some objective evidence

18  tending to establish myelopathy or spinal cord damage among whatever other evidence supports

19  or refutes the conclusion that the insured plan participant is disabled.

20         With this clarification, has Sutton identified the necessary objective evidence within the

21  administrative record?  Some of the evidence Sutton cites is not "objective."  That is true, for

22  example, of his reports of pain and numbness.  These are subjective.  *Cf., e.g.*, *Saffon v. Wells*

23  *Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008) ("[I]ndividual

24  reactions to pain are subjective . . . .").  Nor are the brief notes in MetLife's records objective

25  evidence.  Although many of these notes state that Sutton has been diagnosed with myelopathy,

26  they do not cite any of the evidence that courts have described as "objective," such as reports

27  based on lab tests or medical imaging.  *Cf., e.g.*, *Salomaa v. Honda Long Term Disability Pl.*,

28  642 F.3d 666, 678 (9th Cir. 2011) (listing blood tests, x-rays, and MRI reports as examples of

1   "objective" evidence).  The same is true of the notes from Dr. Lombard's and Dr. Blake's offices.

2   These notes repeat the conclusions one might draw from objective evidence.  They are not

3   themselves objective evidence.

4          But some of the evidence in the record is objective.  First are the clinical observations of

5   reduced or absent reflexes in Sutton's legs.  *See, e.g.*, AR 27, 1067.  MetLife disputes neither that

6   clinical observations are objective evidence nor that absent reflexes can be attributed to

7   myelopathy.  Dr. Zheng appears to agree; he wrote that absent reflexes do not suggest myelopathy

8   "by themselves."  AR 822.  Second, Sutton cites the MRI and x-ray reports.  MetLife does not

9   dispute that these reports are objective, and it does not dispute that spinal stenosis can cause

10  myelopathy, and it cannot dispute that "spondylosis" is a broad term that describes degeneration

11  of the spine, including conditions resulting in myelopathy.  According to the sources MetLife

12  cites in its briefing, the "[c]auses of myelopathy include spinal stenosis," *see* Defs.' Resp. at 1 n.2

13  (citing Hopkins Medicine, *supra*), and spondylosis can describe "pain and spine degeneration"

14  caused by "spinal stenosis," s*ee* Defs.' Br. at 7 (citing David DeWitt, "Spondylosis: What it

15  Actually Means" (Apr. 11, 2016)).[7]

16         To be clear, these clinical observations and imaging reports do not prove Sutton suffers

17  from myelopathy.  Nor do they exclude other potential causes of his back pain.  But as explained

18  above, the plan does not require this sort of conclusive proof.  Clinical reports of absent and

19  reduced reflexes combined with x-rays and MRIs suggesting spinal stenosis and spondylosis are

20  objective evidence "of" myelopathy as the court has interpreted that phrase.

21         MetLife relies on several arguments minimizing this evidence.  First, it cites Dr. Zheng's

22  opinions.  As summarized above, based on his review of the file alone, Dr. Zheng believes

23  Sutton's medical records do not show he suffers from myelopathy because he can walk and move

24  his arms and legs normally, because the 2021 MRI report states there was "no significant central

25  canal stenosis," because "most"—but not all—of the findings relate to an area in the spine where

26  "there is no cord," and because absent reflexes "do not suggest myelopathy by themselves."  AR

---

[7] https://www.spine-health.com/conditions/lower-back-pain/spondylosis-what-it-actually-means (last visited July 14, 2023).

821–23, 858, 963.  These opinions do not show there is no "objective evidence of" myelopathy.  As explained above, the plan does not require objective evidence excluding other causes, does not require objective evidence supporting a conclusive diagnosis, and does not require the evidence to be uniformly in support of Sutton's claim.  There also are reasons not to give dispositive weight to Dr. Zheng's opinions.  Putting aside the fact that MetLife was paying Dr. Zheng, he did not examine or speak to Sutton or any of Sutton's doctors.  He did not review any medical images first-hand.

Second, MetLife draws a number of negative inferences from the administrative record.  It points out the records of Sutton's spinal surgeon do not refer to myelopathy.  *See* Defs.' Resp. at 3–4.  It makes the same point about the x-ray and MRI reports.  *Id.* at 6.  It cites Dr. Blake's letter, which does not mention myelopathy.  *Id.* at 5–6.  And it cites an award letter granting Sutton Social Security Disability Insurance benefits, which does not mention myelopathy.  Defs.' Br. at 7–8.  MetLife does not point to any policy provisions permitting it to deny benefits based on negative inferences.  It does not dispute that Sutton is disabled; it has paid disability benefits to Sutton for the twenty-four month period that was not subject to the exclusion now in dispute.  Nor did MetLife deny coverage because it had no confirmation that a confirmed diagnosis of myelopathy or spinal cord damage was the cause of Sutton's back pain or disability.  It denied coverage because it found no "objective evidence of" myelopathy or spinal cord damage.  This court may not affirm MetLife's denial based on reasoning it did not rely on at the time.  *See Collier*, 53 F.4th at 1188.

Third, MetLife cites Dr. Blake's records, which state that Sutton has "spondylosis without myelopathy."  Defs.' Resp. at 4–5.  These notes, like Dr. Lombard's notes, are not "objective evidence."  They report conclusions one might draw from objective evidence.  And in any event, as discussed above, the policy does not require that evidence support Sutton's claim uniformly.  /////

IV.     **CONCLUSION**

Sutton has established that MetLife erroneously denied benefits under 29 U.S.C. § 1132(a)(1)(B).  **Within twenty-eight days**, the parties shall meet and confer and file a further status report proposing a schedule for final resolution of this matter.

IT IS SO ORDERED.

DATED:  July 19, 2023.

_____
CHIEF UNITED STATES DISTRICT JUDGE